Eric JACOBSON, Plaintiff,

v.

Arnold SCHWARZENEGGER, et al., Defendants.

Case No. CV 04–3629–JFW (JTL).

United States District Court, C.D. California.

Aug. 25, 2009.

Eric C. Jacobson, Eric C. Jacobson Law Offices, Culver City, CA, pro se.

Paul C. Epstein, Office of Attorney General of California, Los Angeles, CA, for Defendants.

## ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

JOHN F. WALTER, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Third Amended Complaint, all the records and files herein, and the Amended Report and Recommendation of the United States Magistrate Judge. The Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

IT IS ORDERED that: (1) defendants' Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56 is granted; (2) plaintiff's Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56 is denied; and (3) judgment shall be entered dismissing this action with prejudice as to Claim Twelve and without prejudice as to Claims Thirteen and Eighteen.

## AMENDED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JENNIFER T. LUM, United States Magistrate Judge.

The Court submits this Amended Report and Recommendation to the Honorable John F. Walter, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 05–07 of the United States District Court for the Central District of California.

## INTRODUCTION

On May 21, 2004, plaintiff Eric Jacobson ("plaintiff" or "Jacobson"), a licensed California attorney, filed a civil rights complaint pursuant to Title 42, United States Code, Section 1983 ("Complaint"). The Complaint asserted claims on Jacobson's own behalf and also purported to represent the interests of a "caste" of California parolees under the doctrine of third party standing. The Complaint named as defendants: (1) California Governor Arnold Schwarzenegger; (2) former California Governor Gray Davis; (3) former California Youth and Adult Correctional Agency Secretary Roderick Hickman; (4) former California Youth and Adult Correctional Agency Secretary Robert Presley; (5) California Board of Prison Terms (the "Board")[1] chairperson Margarita E. Perez; (6) former Board chairperson Carol Daly; (7) Board Associate Chief Deputy Commissioner Thomas Wadkins; (8) Board Chief Counsel Terry R. Farmer; (9) Board Executive Director Marvin E. Speed, II; (10) Board Chief Deputy Commissioner Ken Cater; (11) Board officials Sandra Maciel, Tracy Master, and Marc D. Remis; (12) Board counsel Dan Moeller; (13) former California Department of Corrections ("CDC") Director Jeanne S. Woodford; (14) former CDC Director Edward S. Alameida; and (15) parole agent Brigitte Murria.

On August 6, 2004, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a motion for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e), and a motion to strike pursuant to Federal Rule of Civil Procedure 12(f). On November 30, 2004, United States Magistrate Judge James W. McMahon dismissed the Complaint with leave to amend. *See Jacobson v. Schwarzenegger,* 357 F.Supp.2d 1198, 1205 (C.D.Cal.2004).

---

1. The Board is now called the Board of Parole Hearings.

On January 31, 2005, Jacobson filed a First Amended Complaint, adding a second plaintiff, Eric Johnson ("Johnson"), whom Jacobson represented in his capacity as attorney. The First Amended Complaint contained class action allegations wherein Johnson purported to represent a class of "all felons currently serving determinate sentences and all felons who have completed determinate sentences and been released to parole terms but have not yet been discharged from parole." (*See* First Amended Complaint ¶¶ 128–38).

On February 15, 2005, Magistrate Judge McMahon *sua sponte* dismissed the First Amended Complaint, with leave to amend, on the ground that it violated the mandate of Federal Rule of Civil Procedure 8(a) that a complaint must contain a "short and plain" statement of the claim for relief. *See Jacobson v. Schwarzenegger*, 226 F.R.D. 395, 397–98 (C.D.Cal.2005). On March 11, 2005, Jacobson and Johnson filed a Second Amended Complaint.

On August 31, 2005, Jacobson and Johnson filed a Third Amended Complaint. The Third Amended Complaint contained two sets of claims. Claims One through Eleven challenged various aspects of California's parole revocation system and were asserted by Johnson as class claims and by Jacobson under the doctrine of third party standing. Claims Twelve through Eighteen were asserted by Jacobson alone and consisted of a federal retaliatory termination claim and six pendent state law claims.

On September 30, 2005, defendants filed a Motion to Dismiss the Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss"). While the Motion to Dismiss was pending, Magistrate Judge McMahon retired and the case was reassigned to this Court. On January 16, 2007, the Court issued a Report and Recommendation ("January 16, 2007 Report and Recommendation") recommending that the Motion to Dismiss be granted in part and denied in part, and that the claims asserted by both Johnson and Jacobson be dismissed as to Jacobson and severed from the claims asserted by Jacobson alone. On August 1, 2007, the district court adopted the recommendations of the January 16, 2007 Report and Recommendation and dismissed, without leave to amend, the following claims: (1) Claims One through Eleven as asserted by Jacobson only; (2) Claims Two, Three, Six, Seven, Ten, and Fourteen through Seventeen; (3) Claim Twelve as against all defendants except Farmer, Speed, Wadkins, Cater, and Murria; and (4) Claims Thirteen and Eighteen as against all defendants except defendants Farmer, Speed, Wadkins, and Cater. (Order Adopting Findings, Conclusions, and Recommendations, filed August 1, 2007).

On September 6, 2007, United States District Judge John F. Walter severed the remaining claims asserted by Johnson (Claims One, Four, Eight, Nine and Eleven) from the remaining claims asserted by Jacobson (Claims Twelve, Thirteen and Eighteen), and ordered that they be assigned a new case number.[2] This action then proceeded with Jacobson as the *pro se* plaintiff, defendants Farmer, Speed, Wadkins, Cater, and Murria ("defendants") as the remaining defendants, and Claims Twelve, Thirteen, and Eighteen as the remaining claims.[3]

---

**2.** Johnson's severed claims were assigned Case No. CV 07–6176–JFW (JTLx). On February 14, 2008, District Judge Walter granted the defendants' motion for judgment on the pleadings and dismissed the action, without prejudice.

**3.** On September 3, 2008, plaintiff filed a motion for leave to add an additional defendant, Deputy Commissioner Fernando Perez. On November 3, 2008, the Court denied the motion.

On December 10, 2007, defendants filed an Answer to the Third Amended Complaint. On August 29, 2008, defendants filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 ("Defendants' Motion" or "Def. Motion"). Defendants' Motion was accompanied by declarations and other evidentiary material, a Separate Statement of Undisputed Material Facts, a proposed Statement of Uncontroverted Facts and Conclusions of Law ("Def. St. Uncontroverted Facts"), and a proposed Judgment.

Plaintiff also filed a Motion for Partial Summary Judgment on August 29, 2008, pursuant to Federal Rule of Civil Procedure 56 ("Plaintiff's Motion" or "Pl. Motion"). Plaintiff's Motion was accompanied by his declaration (Declaration of Eric C. Jacobson, dated August 29, 2008 ["Jacobson Decl."]) and other evidentiary materials, and a Separate Statement of Uncontroverted Facts ("Pl. St. Uncontroverted Facts"). On September 16, 2008 defendants filed an Opposition to Plaintiff's Motion ("Defendants' Opposition" or "Def. Opp."), accompanied by a Statement of Genuine Issues.

On September 17, 2008, plaintiff filed an Opposition to Defendants' Motion ("Plaintiff's Opposition"), accompanied by evidentiary materials. On September 23, 2008, plaintiff filed a Reply to Defendants' Motion ("Plaintiff's Reply"). Defendants also filed a Reply to Plaintiff's Motion ("Def. Reply") and objections to plaintiff's declaration ("Def. Obj. to Jacobson Decl.") and to plaintiff's exhibits ("Def. Obj. to Pl. Exh.") on September 23, 2008.

On September 30, 2008, plaintiff submitted another declaration in support of his motion and in opposition to Defendants' Motion ("Plaintiff's September 30, 2008 Declaration"). On October 2, 2008, defendants filed an *ex parte* application to strike plaintiff's filings as untimely and violative of Local Rules 11–6 and 11–8.

On October 24, 2008, the Court issued a minute order striking Plaintiff's Opposition, Plaintiff's Reply, and Plaintiff's September 30, 2008 Declaration. The Court granted plaintiff until October 31, 2008 to refile these documents, and granted defendants additional time to file a reply.

On November 3, 2008, plaintiff filed a revised Opposition to Defendants' Motion ("Pl. Rev. Opp.") and a revised declaration in opposition to Defendants' Motion and in support of Plaintiff's Motion (Revised Declaration by Plaintiff Eric C. Jacobson, dated November 3, 2008 ["Jacobson Rev. Decl."]). On November 4, 2008, plaintiff filed a revised Reply to Defendants' Opposition ("Pl. Rev. Reply"). Plaintiff subsequently filed additional evidentiary materials and, on November 24, 2008, filed a memorandum regarding his exhibits ("Plaintiff's Memorandum re Exhibits").

On November 19, 2008, defendants filed a Reply to Plaintiff's Revised Opposition ("Def. Rev. Reply"). On December 2, 2008, defendants filed separate objections to: (1) plaintiff's revised declaration ("Def. Obj. to Jacobson Rev. Decl."); (2) plaintiff's audio-recordings of deposition excerpts ("Def. Obj. to Audio."); (3) plaintiff's Memorandum re Exhibits ("Def. Obj. to Memo."); and (4) the Declaration of Larry Starn ("Def. Obj. to Starn Decl.").

On March 13, 2009, the Court issued a Report and Recommendation ("March 13, 2009 Report and Recommendation") recommending that: (1) plaintiff's Motion for Summary Judgment be denied; (2) defendants' Motion for Summary Judgment be granted; and (3) the action be dismissed with prejudice.

On March 30, 2009, plaintiff filed a pleading, denoted as a motion under Rules 59 and 60 of the Federal Rules of Civil Procedure, requesting the Court to: (1) deem itself without jurisdiction to hear and determine the Motions; (2) reconsider

and vacate the March 13, 2009 Report and Recommendation; and (3) grant plaintiff an extension of time to transcribe the previously submitted deposition excerpts. On April 24, 2009, the Court issued a minute order in which it construed plaintiff's motion as objections to the March 13, 2009 Report and Recommendation ("Objections"), and granted plaintiff an extension of time to submit transcripts of the deposition excerpts he wished the Court to consider.[4] On May 15, 2009, plaintiff submitted transcripts of excerpts of five audiotaped depositions, accompanied by his declarations. On May 21, 2009, defendants filed objections to the deposition transcripts and a response to plaintiff's Objections ("Def. Obj. to Tr."). The Court now submits this Amended Report and Recommendation.

Both motions are fully briefed and under submission.

## SUMMARY OF PLAINTIFF'S REMAINING CLAIMS

Plaintiff's remaining claims against defendants consist of one federal claim (Claim Twelve) and two pendent state law claims (Claims Thirteen and Eighteen). In Claim Twelve, plaintiff asserts a First Amendment retaliation claim based on the theory that defendants removed him from the parole revocation attorney appointment list in retaliation for his criticisms of the Board and advocacy of parolee rights. (Third Amended Complaint ¶ 173). In Claim Thirteen, plaintiff contends that his allegedly retaliatory removal from the attorney appointment list violated his rights under the California constitution. (Id. at ¶ 174). In Claim Eighteen, plaintiff contends that his removal from the attorney appointment list constituted an intentional infliction of emotional distress. (Id. at ¶ 179 [erroneously denominated ¶ 115]).

## FACTUAL BACKGROUND

Plaintiff is a California attorney. (Jacobson Rev. Decl. at 2). In September 1998, the state appointed plaintiff to a list of attorneys eligible to represent parolees at parole revocation hearings before the Board. (Transcript of the Deposition of Eric C. Jacobson ["Jacobson Depo."] at 25). The terms of the contractual relationship between plaintiff and the Board were set forth in the Board's "Attorney Packet." (See Def. Exh. B). Appointed attorneys were compensated at $30.00 per hour (less when plaintiff was first appointed to the list) for up to six hours per case, unless appointed counsel obtained prior approval to bill more time for a complex case, or the parolee had communication problems falling under the Americans with Disabilities Act. (Def. Exh. B at 22, 30; Jacobson Depo. at 60). On September 16, 2003, plaintiff was removed from the attorney appointment list. (Jacobson Decl. ¶ 2; Def. Exh. N). This action revolves around the parties' different claims as to why plaintiff was removed from the list. Plaintiff contends that he was removed from the list in retaliation for his zealous representation of his clients, his vocal advocacy of parolee rights, and his criticisms of California's parole system. (Jacobson Rev. Decl. at 18). Plaintiff contends that he was one of the most capable and effective parole revocation counsel, providing superior quality representation to the parolees he was appointed to represent. (Id. at 13; Jacobson Depo. at 77–78, 81). Starting in 2001, plaintiff "repeatedly and strenuously articulated the illegal and unconstitutional treatment which [his] clients routinely en-

4. The Court also explained to plaintiff that his objections to its jurisdiction were unfounded because the Court is not issuing a ruling on the cross-motions for summary judgment, but only a report and recommendation to United States District Judge John F. Walter, who will rule on the cross-motions.

dured, placed them on record during hearings, and demanded that cognizance be taken of them by [Board] deputy commissioners."[5] (Jacobson Decl. at 14; *see* Jacobson Depo. at 80). In addition, plaintiff sometimes pursued administrative appeals on his clients' behalf and wrote letters to Board officials in which he (1) complained about misapplication of the law and abusive conduct by deputy commissioners at their hearings and (2) requested a review of their parole revocation dispositions. (Jacobson Depo. at 81–82; Jacobson Rev. Decl. at 14; Jacobson Decl. ¶¶ 5–6). Plaintiff wrote these letters, notwithstanding the fact that his contract with the Board prohibited plaintiff from billing the Board for the time spent on these letters, or for assisting parolees with administrative appeals. (Jacobson Depo. at 59; Jacobson Rev. Decl. at 8, 10–11). He estimates that during his five years as a Board-appointed parole revocation counsel, he authored five to fifteen administrative appeals on behalf of his clients, and wrote about five to ten letters requesting review of the parole commissioner's decision. (Jacobson Depo. at 104).

Defendants contend that plaintiff's criticisms of the Board and advocacy of parolee rights had nothing to do with his removal from the attorney appointment list. Defendants assert that plaintiff was removed from the list for unsatisfactory performance. To substantiate their contention, defendants have submitted evidence of several instances during plaintiff's five-year tenure when he was late for a hearing or failed to appear. For example, on November 30, 1998, plaintiff failed to appear at two parole revocation hearings and they had to be postponed. (Declaration of Ste-

ven Hernandez, dated August 20, 2008 ["Hernandez Decl."] ¶ 4; Declaration of Monica Smith, dated August 21, 2008 ["Smith Decl."] ¶ 6, Exh. A). Plaintiff testified that he did not appear because he believed that the hearings had been rescheduled or that he had been reassigned. (Jacobson Depo. at 117–18). In a memorandum dated December 3, 1998, Associate Chief Deputy Commissioner Monica Smith requested an investigation into complaints about plaintiff's performance. In her memo, Smith stated that, according to Deputy Commissioner Carol Cantu and Regional Hearing Coordinator Steven Hernandez,

> [Plaintiff] has been continually late for his assigned hearings and does not interview his clients ahead of the hearing date. This poses due process concerns and results in postponed hearings impacting our hold-to-hearing time frames. On this last instance, he stated he had been notified that his hearing had been canceled. He had been assigned two cases so it appears he is fabricating or at the least misrepresenting the facts. He is not reachable by phone or by pager and does not respond to messages left for on voice mail. It is not permissible to interview the parolees on the same day as the hearing due to interruption and delay of the calendar and more importantly the inability to request any needed witnesses.

(Smith Decl. ¶¶ 5, 6, Exh. B; *see also* Exh. A [memorandum dated November 30, 1998, from Cantu to Smith]).

On April 20, 1999, Cantu prepared another memorandum to Smith, stating that plaintiff had requested permission to inter-

---

**5.** The Court will not summarize plaintiff's criticisms of California's parole system in the Third Amended Complaint and in his briefs and declarations, as his claims challenging California's parole system were severed from this action and his views regarding its flaws are not an issue here. The Court will only discuss, where appropriate, the criticisms plaintiff makes in the letters that he identifies as protected speech.

view a parolee client half an hour before her scheduled revocation hearing but did not arrive until the time scheduled for the hearing, necessitating a 20–minute postponement of the hearing. (Smith Decl. ¶ 6, Exh. C; *see* Jacobson Depo. at 122). On June 1, 1999, plaintiff arrived late for the first of his two scheduled hearings and stated that he had not yet interviewed the parolees. (Hernandez Decl. ¶ 5; Exh. A [memorandum dated June 22, 1999 from Hernandez to Smith]). Plaintiff conducted the interviews but the hearings were postponed, and Associate Chief Deputy Commissioner Richard Washington reprimanded plaintiff, telling him that he should not conduct parolee interviews on the day of the hearing. (Jacobson Depo. at 121–22, 131). Plaintiff believes that the incident was handled in this manner because the parole hearings that day were being videotaped on behalf of the plaintiff class in the action *Valdivia v. Schwarzenegger*, CV S–9400671 LKK/GHK. (Jacobson Depo. at 131).

On August 3, 1999, Ted Rich, at that time Acting Executive Officer for the Board, sent a letter to plaintiff advising him that the Board was considering his removal from the attorney appointment list because it had "received numerous complaints from Board and Department of Corrections staff regarding [plaintiff's] tardiness, inadequate preparation and representation of clients, and disrespect shown towards institutional security policies." (Declaration of Ted Rich, Sr., dated August 28, 2008 ["Rich Decl."] ¶¶ 2, 3, Exh. A). Plaintiff admits that he received the letter and that there were complaints about him, but disputes that the complaints were "numerous," or that they were justified. (Jacobson Depo. at 158–62).

Two years later, on June 6, 2001, regional hearing coordinator Ricardo Valencia prepared a memorandum to Associate Chief Deputy Commissioner Washington describing an incident when plaintiff was tardy and delayed the commencement of a hearing while soliciting clients. (Def. Exh. G at 30). Valencia asked Washington to remove plaintiff from the attorney appointment list. (*Id.*). Plaintiff disputes that the incident ever occurred. (Jacobson Depo. at 163–66).

On May 21, 2003, plaintiff represented parolee Averon Fletcher at a revocation hearing at the Los Angeles County Jail ("Jail"). (Jacobson Rev. Decl. at 42). Plaintiff vigorously cross-examined Fletcher's parole agent, defendant Murria. (*Id.* at 42–43). After the hearing, plaintiff approached Murria and told her that he had no choice but to cross-examine her vigorously and that in the future she should provide more complete responses to questions. (*Id.* at 43). Murria testified that plaintiff touched or tapped her on the shoulder when he approached her, and that she found the action offensive and told him not to put his hand on her shoulder. (Transcript of Deposition of Brigitte Murria ["Murria Depo."] at 46, 47, 48–49, 50). Plaintiff testified that it is possible that he might have tapped Murria on the shoulder to get her attention, although he does not recall doing so; however, he specifically recalls that she never asked him to remove his hand. (Jacobson Depo. at 177–78).

After the hearing, Deputy Commissioner Fernando Perez called Murria and told her that he had observed the incident and considered it inappropriate, and that "if anything was to come out of it," she would know why because Perez planned to "write it up." (Murria Depo. at 40, 44). Defendant Murria did not file a complaint, nor did she take any other action regarding the incident. (Murria Depo. at 80–81). Perez prepared a memorandum that, according to plaintiff, misrepresented where the incident occurred and what Murria

said to plaintiff.[6] (Def. Exh. J; Jacobson Rev. Decl. at 43–44).

Plaintiff was then notified that he was being suspended from the attorney appointment list pending an investigation of the incident. (Jacobson Rev. Decl. at 46). On July 1, 2003, defendant Speed notified plaintiff by letter that the investigation was complete and he was being restored to the attorney appointment list. (Declaration of Marvin Speed, dated August 28, 2008 ["Speed Decl."] ¶ 1, Exh. A). Speed advised plaintiff that he had determined that his questioning of Murria, although aggressive, was not inappropriate, but characterized plaintiff's decision to talk with Murria after the hearing as "ill conceived," and his placing a hand on her shoulder as "uncalled for and inappropriate under the circumstances." (Speed Decl., Exh. A). Speed also notified plaintiff that, although plaintiff was no longer suspended, he would not receive assignments until he signed the attorney packet, which all attorneys on the appointment list were required to sign by February 28, 2003. (Id.).

On July 14, 2003, plaintiff responded to defendant Speed's letter. (Def. Exh. S). Plaintiff described his questioning of defendant Murria and his subsequent encounter with her. (Id.). He asserted that he did not recall putting his hand on her shoulder, and denied that she ever asked him to remove his hand. (Id.). Plaintiff expressed his indignation at having been suspended from the attorney appointment list during the investigation of the incident, as well as his belief that defense revocation counsel would be deterred from zealous advocacy of parolees if any parole agent could cause counsel's suspension from the list simply by complaining of inappropriate conduct that never occurred. (Id.).

On August 27, 2003, defendant Wadkins prepared a memorandum to defendant Cater, stating that on August 20, 2003, plaintiff had failed to appear at the Jail for his assigned "second serves." [7] (Declaration of Thomas Wadkins, dated August 29, 2008 ["Wadkins Decl."] ¶¶ 2, 3, Exh. A; Declaration of Ken Cater, dated August 29, 2008 ["Cater Decl."] ¶ 2). Wadkins also noted the incident involving Murria and the existence of prior complaints about plaintiff, and recommended that plaintiff not be assigned additional cases or second serves pending an investigation. (Wadkins Decl., Exh. A). Cater forwarded the memorandum to the Board counsel, defendant Farmer. (Cater Decl. ¶ 3).

On August 28, 2003, defendant Wadkins sent plaintiff a letter advising him that he was being considered for removal from the attorney appointment list as a result of missing "second serves" on August 20, 2003, and asked him to submit a response. (Wadkins Decl., Exh. B). Plaintiff responded by letter dated September 2, 2003, expressing his belief that his removal from the attorney list based on a single missed "second serve" appointment due to

---

**6.** According to Perez's memo, the incident occurred in the hearing room and Murria told plaintiff to "take your hands off me." (Def. Exh. J). Murria testified that the incident occurred in the hallway outside the hearing room, and that she told plaintiff to remove his hand from her shoulder, but did not recall her exact words. (Murria Depo. at 46, 47, 82, 83).

**7.** A parolee picked up for a parole violation is offered a certain amount of additional time in a correctional facility and can either accept the offer or challenge the charged violation at a parole revocation hearing. Pursuant to the remedial order in *Armstrong v. Davis*, No. CV 94–02307 CW (N.D.Cal.), parolees with medical problems that interfere with their ability to evaluate an offer are given an additional 72 hours after being served with the offer, and are then served with the offer again (the so-called "second serve") in the presence of their attorneys. (Wadkins Decl. ¶ 3).

a calendaring error could only be motivated by retaliation for plaintiff's successful refutation of the charges against him made by defendant Murria. (Def. Exh. L). Wadkins forwarded the letter to defendants Speed, Cater, and Farmer. (Def. Exh. M).

Wadkins declares that he then recommended to defendant Cater that plaintiff be suspended from the attorney appointment list for 90 days, basing his recommendation on the reasons set forth in his memorandum. (Wadkins Decl. ¶ 6). He declares that he never recommended that plaintiff be permanently removed from the attorney appointment list, nor did he make the decision to remove him. (Id.).

The decision to remove plaintiff from the attorney appointment list was made by defendant Speed. (Speed Decl. ¶ 3; Cater Decl. ¶ 4). Cater did not make the decision, nor did he recommend to Speed that plaintiff be permanently removed from the attorney appointment list. (Cater Decl. ¶ 4). Speed declares that he decided to remove plaintiff from the attorney appointment list based on the information in Wadkins' memorandum to Cater, namely, plaintiff's "history of missing hearings, being late to hearings, and being unprepared for hearings," as well as the incident with defendant Murria, and that he had not received any information, before making his decision, that plaintiff was overzealous in his representation of parolees or critical of the California parole system. (Speed Decl. ¶¶ 3, 4). On September 16, 2003, defendant Farmer advised plaintiff, by letter, that he would not be assigned any additional cases "at this time." (Def. Exh. N). Despite the ambiguous phraseology, the parties agree that this constituted removal from the attorney appointment list.

Plaintiff declares that because parolee rights were his sole field of legal expertise, he was obliged to continue working in the field of parolee civil rights after his removal from the attorney appointment list, so far without compensation. (Jacobson Rev. Decl. at 71). He seeks declaratory relief, an injunction directing his reinstatement, and compensatory and punitive damages. (Third Amended Complaint ¶¶ 187–89).

## LEGAL STANDARDS REGARDING SUMMARY JUDGMENT

A federal court must grant summary judgment if the papers show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A "genuine issue" exists if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the suit under governing law. See id. The court must believe the nonmoving party's evidence and must view inferences it draws from the underlying facts in the light most favorable to the nonmoving party. See id. at 255, 106 S.Ct. 2505; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the moving party need not disprove the other party's case. Id. at 323–24, 106 S.Ct. 2548. The moving party need not produce admissible evidence showing the absence of a genuine issue of material fact when the non-moving party has the burden of proof, but may discharge its burden simply by pointing out that there is an absence of evidence to support the non-moving party's case. Id. at 324, 325, 106 S.Ct. 2548.

Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

When the moving party has the burden of proof on an issue, *e.g.,* when a plaintiff seeks summary judgment on a claim for relief or a defendant seeks summary judgment on an affirmative defense, the moving party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States,* 799 F.2d 254, 258–59 (6th Cir.1986); *Inamed Corp. v. Medmarc Cas. Ins. Co.,* 258 F.Supp.2d 1117, 1120 (C.D.Cal.2002).

When both plaintiff and defendant file cross-motions for summary judgment, it does not follow that no genuine issue of material fact exists. "[A] party may argue that no issue exists in the hope that his legal theory will be accepted, but at the same time the movant may maintain that there is a genuine factual dispute in the event his theory is rejected or the opponent's is adopted." 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (2008). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent

the entry of judgment as a matter of law against it." *Zook v. Brown,* 748 F.2d 1161, 1166 (7th Cir.1984) (quoting *Schwabenbauer v. Bd. of Educ.,* 667 F.2d 305, 313 (2d Cir.1981)); *Brawner v. Pearl Assurance Co.,* 267 F.2d 45, 46 (9th Cir.1958) ("[S]ummary judgment cannot be granted if there be a disputed issue of material fact. This determination does not depend upon what either or both parties may have thought about the matter.").

The court may only consider admissible evidence in ruling on a motion for summary judgment. *Ballen v. City of Redmond,* 466 F.3d 736, 745 (9th Cir.2006).

## PRELIMINARY MATTERS

### I. *DEFENDANTS' EVIDENTIARY OBJECTIONS*

#### A. *Defendants' Objections to Plaintiff's Declaration*

Defendants raise a variety of objections to plaintiff's declaration. (Def. Obj. to Pl. Decl. at 2–15). Defendants initially object to plaintiff's declaration in its entirety. This objection is DENIED. Defendants' specific objections to Paragraphs 2, 8, 9, 10, and 16 are also DENIED. Defendants' objections to Paragraphs 3, 6, 7, 11, 12, 13, 14, and 15 are GRANTED. Legal arguments do not belong in a declaration, and plaintiff's summary of a non-party's deposition testimony constitutes inadmissible hearsay. *See* Fed.R.Evid. 402, 801(c), 802.

#### B. *Defendants' Objections to Plaintiff's Exhibits*

Defendants object to plaintiff's Exhibits 5, 6, 9, 15, 16, 17, and 18. (Def. Obj. to Pl. Exh.). The Court DENIES defendants' objections.

◼ Defendants object that Exhibits 5 and 6, which consist of drafts of plaintiff's letters to Richard Washington, are insuffi-

ciently authenticated. (Def. Obj. to Pl. Exh. at 2). To the extent that plaintiff's attempt to authenticate them through Paragraph 16 of his declaration is defective, plaintiff presumably could authenticate his own letters. *See Hal Roach Studios, Inc. v. Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir.1990) (court's consideration of unauthenticated evidence was harmless error when a competent witness with personal knowledge could have authenticated it). In regards to Exhibits 9, 15, and 16, consisting of internal Board memoranda, defendants do not dispute their authenticity and, in fact, themselves offer Exhibit 9 as evidence. (*See* Def. Exh. J). *See Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1120 (E.D.Cal.2006) (criticizing objections to authentication on summary judgment motion "where the objecting party does not contest the authenticity of the evidence submitted but nevertheless makes an evidentiary objection based on purely procedural grounds").

Exhibits 17 and 18 do not constitute evidence. Although plaintiff should have separately lodged his proposed order granting his summary judgment motion (Exhibit 17) and filed his belated verification of the Third Amended Complaint (Exhibit 18),[8] rather than making them exhibits to his motion, this is not a basis for the Court refusing to consider them.

## C. *Defendants' Objection to Plaintiff's Revised Declaration*

Defendants object to plaintiff's 73–page revised declaration on the grounds that it is "replete with argument and opinion, and in fact contains almost nothing but that," and that it is, in effect, a trial brief arguing the evidence. (Def. Obj. to Pl. Rev. Decl. at 2). Defendants move to strike plaintiff's revised declaration. (*Id.*).

Defendants' characterization of plaintiff's revised declaration is largely correct. In addition, the revised declaration, despite its length, does not contain numbered paragraphs and discusses matters that are of tangential or no relevance to this action, or of which plaintiff has no personal knowledge. Nevertheless, the Court will not strike the entire declaration but will, instead, consider only those portions that are admissible under Fed.R.Civ.P. 56(e) for purposes of the parties' cross motions for summary judgment. Defendants' objections, therefore, are DENIED.

## D. *Defendants' Objections to Plaintiff's Deposition Excerpts*

Plaintiff elected to record depositions nonstenographically, as was his right.[9] *See* Fed.R.Civ.P. 30(b)(3)(A). However, in order to use the depositions on a motion for summary judgment, plaintiff is required to provide the Court with a transcript. *See* Fed.R.Civ.P. 32(c) ("Unless the court orders otherwise, a party must provide a transcript of any deposition testimony the party offers, but may provide the court with testimony in nontranscript form as well.") & Advisory Committee's Notes on 1993 Amendment ("Under this rule a party may offer deposition testimo-

---

8. For purposes of summary judgment, a verified complaint may be treated as an affidavit or declaration to the extent that it is based on personal knowledge and sets forth facts admissible in evidence. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir.1995); *McElyea v. Babbitt*, 833 F.2d 196, 197–98 (9th Cir.1987); Fed.R.Civ.P. 56(e).

9. Defendants apparently arranged for a court reporter to stenographically record the depositions taken by plaintiff, and they had transcripts prepared for their convenience. Defendants cited to deposition testimony of defendants Speed and Murria in connection with their motion and opposition to plaintiff's motion, and have lodged the full transcripts of these two depositions with the Court.

ny in any of the forms authorized under Rule 30(b) but, if offering it in a nonstenographic form, must provide the court with a transcript of the portions so offered."); Fed.R.Civ.P. 30(b), Advisory Committee's Notes on 1993 Amendment ("A party choosing to record a deposition only by videotape or audiotape should understand that a transcript will be required by Rule 26(a)(3)(B) and Rule 32(c) if the deposition is later to be offered as evidence at trial or on a dispositive motion under Rule 56."); Local Rule 32–1.

Plaintiff submitted to the Court audiotapes and CDs of excerpts of depositions taken by him in this action. Defendants objected to the audiotapes and CDs on the grounds that the Federal Rules of Civil Procedure and the local rules of this court require plaintiff to lodge a transcript of the deposition testimony. (Def. Obj. to Audio. at 2). In its original Report and Recommendation, the Court declined to listen to the audiotapes and CDs without benefit of a transcript of the pertinent portions. In his Objections, plaintiff requested an extension of time to prepare and submit transcripts. The Court granted him an extension of time to submit transcripts of deposition testimony he wished the Court to consider.

Plaintiff then filed transcriptions of portions of the audio-recordings of the depositions of defendants Wadkins, Speed, Cater, and Murria and non-party Richard Washington, each transcript accompanied by a declaration setting forth the manner of its preparation. Plaintiff declared that the transcripts were prepared by him, with assistance from his wife. Defendants object to these transcripts on the grounds that they have not been properly authenticated and were not prepared by a neutral party. (Def. Obj. to Tr. at 2–3).

Defendants are correct that the transcripts submitted by plaintiff lack a certification by the deposition officer before whom the depositions were taken. *See Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774 (9th Cir.2002) ("A deposition or an extract therefrom is authenticated in a motion for a summary judgment when it identifies the names of the deponent and action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent."); Fed. R.Civ.P. 30(f)(1). Defendants also correctly point out that the excerpts are long and plaintiff does not identify the pages that contain the testimony he wishes the Court to consider. *See Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (the court is entitled to rely on the nonmoving party "to identify with reasonable particularity the evidence that precludes summary judgment").

■ The Court, however, rejects defendants' argument that Rule 28(c), which requires a deposition to be taken before a neutral deposition officer, by extension requires an audiotaped deposition to be transcribed by a neutral party. *See* Fed. R.Civ.P. 26(c), Advisory Committee Notes to 1993 Amendment (explaining that a party must provide transcript of a nonstenographic deposition to other parties before trial for verification, "an obvious concern since counsel often utilize their own personnel to prepare transcripts from audio or video tapes"); *see also Hudson v. Spellman High Voltage,* 178 F.R.D. 29, 31 (E.D.N.Y.1998) (concluding that the Advisory Committee Notes to 1993 Amendment to Rule 30(b)(2) "reflect the legislative intent that law office personnel, rather than an independent stenographer, will most likely prepare the typed transcript of those portions of the audio or video depositions which counsel intends to introduce at trial"). The Court also notes that defendants arranged to have each of the depositions at issue stenographically recorded, and are in possession of transcripts that the court

reporter prepared. Defendants do not dispute the accuracy of plaintiff's transcription of the deposition excerpts. The Court, therefore, DENIES defendants' objections.

### E. *Defendants' Objections to Plaintiff's Memorandum re Exhibits*

In plaintiff's Memorandum re Exhibits, plaintiff discusses the significance of his exhibits and summarizes deposition testimony he believes supports his case. Defendants object to the summaries of the deposition testimony on the grounds that plaintiff has not provided the Court with transcripts of the depositions.

The Court does not intend to rely on plaintiff's summaries as a substitute for deposition transcripts. Accordingly, defendants' objections are DENIED as moot.

### F. *Defendants' Objections to Starn Declaration*

Defendants object to the Declaration of Larry Starn filed by plaintiff in the action *Watson v. Schwarzenegger*, CV 05–0192 JFW (Ctx) and lodged by him in this action. Defendants object to the declaration on a variety of grounds. (Def. Obj. to Starn Decl. at ¶¶ 1–53). The Court did not rely on the Declaration of Larry Starn in making its recommendations with respect to the cross-motions. Accordingly, defendants' objections are DENIED as moot.

## II. *PLAINTIFF'S REQUEST FOR CONTINUANCE*

■ Plaintiff requests a continuance under Rule 56(f) of the Federal Rules of Civil Procedure. He asserts that he had limited time to prepare his Opposition to Defendants' Motion due to his obligations in other cases, and asks that the Court, in the event it does not grant his summary judgment motion to grant him time to obtain additional declarations and prepare a revised opposition to defendants' summary judgment motion. (Pl. Rev. Opp. at 4; Rev. Reply at 4).

■ Rule 56(f) of the Federal Rules of Civil Procedure provides that, "[if] a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may deny the summary judgment motion, or may order a continuance to enable affidavits to be obtained or to enable further discovery. Thus, Rule 56(f) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1000 (9th Cir.2002). However, a party invoking Rule 56(f) must show, by affidavit or declaration: (1) the specific facts that it hopes to elicit; (2) how those facts would preclude summary judgment; and (3) that the evidence sought actually exists. *California v. Campbell*, 138 F.3d 772, 779 (9th Cir.1998); *see Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir.1990) (affirming denial of Rule 56(f) request when party failed to show the existence of additional essential and discoverable evidence). Moreover, the party must show that it has been diligent in gathering the evidence. *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir.2002).

Plaintiff's request for a continuance meets none of these requirements. He has not specified what additional declarations he would submit, how they would preclude summary judgment, or why he was unable to obtain them earlier. Furthermore, the Court already has granted plaintiff an extension of time to provide transcripts of the deposition excerpts he submitted to the Court. To the extent plaintiff wants more time to prepare a revised and extended version of his Opposition, he has already had two opportuni-

ties to file an opposition to defendants' Motion. After the Court struck his initial Opposition for failure to comply with the local rules, plaintiff was granted additional time to file a revised Opposition, and was later granted an extension of time. Plaintiff has filed a 25–page revised Opposition to defendants' Motion, a 73–page declaration, and several binders of evidentiary material. The cross-motions are now under submission. Plaintiff's request for a continuance is DENIED.

## III. COMPLIANCE WITH LOCAL RULE 7–3

Plaintiff contends that defendants' counsel did not comply with Local Rule 7–3 because they did not "discuss thoroughly" the substance of the contemplated motion and a proposed resolution. (Revised Opposition at 12–13). Plaintiff is not contesting that the parties conferred, but only the quality of the conference. The Court declines to recommend that Defendants' Motion be denied or stricken on this basis.

## DISCUSSION

### I. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDMENT CLAIM

In Claim Twelve, plaintiff's sole remaining federal claim, plaintiff contends that defendants violated his First Amendment rights by removing him from the attorney appointment list in retaliation for his zealous representation of parolees and advocacy of parolee rights. (Third Amended Complaint at 173).

In their Motion, defendants contend that they are entitled to summary judgment because: (1) the speech that plaintiff contends triggered his removal from the attorney appointment list was not protected by the First Amendment and (2) plaintiff has no evidence that he was removed from the attorney appointment list on account of his speech. (Def. Motion at 5–19). In his cross-motion, plaintiff contends that he is entitled to summary judgment because: (1) the uncontroverted evidence shows that the decision to remove him from the attorney appointment list was motivated by his "whistleblower complaints" to Board officials; and (2) defendants cannot meet their burden of showing that they would have removed him from the attorney appointment list even if he had not engaged in protected speech. (Pl. Motion at 11–17).

### A. Applicable Law

■ In order to sustain a First Amendment retaliation claim against a public employer, a plaintiff must show that: (1) he or she engaged in constitutionally protected speech; (2) the employer took adverse employment action against him or her; and (3) the speech was a substantial or motivating factor for the adverse action. *Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir.2006), *cert. denied*, 549 U.S. 1323, 127 S.Ct. 1918, 167 L.Ed.2d 567 (2007); *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003); *see Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). If the plaintiff meets this burden, the governmental employer can still escape liability by showing that it would have taken the same action even in the absence of the protected speech. *Umbehr*, 518 U.S. at 675, 116 S.Ct. 2342; *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Moreover, even termination arising from protected speech may be justified when legitimate countervailing government interests are sufficiently strong. *Umbehr*, 518 U.S. at 675, 116 S.Ct. 2342.

■ A public employee's speech is protected under the First Amendment only if it falls within the core of First Amendment protection—speech on mat-

ters of public concern. *Engquist v. Oregon Dept. of Agr.,* —— U.S. ——, 128 S.Ct. 2146, 2152, 170 L.Ed.2d 975 (2008); *Connick v. Myers,* 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *see Connick,* 461 U.S. at 143, 103 S.Ct. 1684; *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, the First Amendment rights of public employees depend on a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern, and the interests of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. The government's interests in effectively and efficiently achieving its goals are owed significantly greater deference when the government acts as an employer than when it acts as a sovereign. *Umbehr,* 518 U.S. at 676, 116 S.Ct. 2342. Thus, even if a public employee's speech touches upon a matter of public concern, the governmental employer can restrict that speech if it can prove that the employee's interest as a citizen in commenting on the matter is outweighed by the interest of the governmental employer in promoting effective and efficient public service. *See Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. The court applies a balancing test to determine whether the government lacked adequate justification for treating the employee differently from any other member of the general public. *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951 (cit-

ing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731).

▮ These principles apply not only to public employees, but also to persons rendering services to the government as independent contractors. *Umbehr,* 518 U.S. at 684–85, 116 S.Ct. 2342. The deference afforded to public employers in regulating employee speech is also warranted in regulating the speech of independent contractors because the government "needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Id.* at 674, 684–85, 116 S.Ct. 2342. There is no "difference of constitutional magnitude between independent contractors and employees" in the First Amendment context. *Umbehr,* 518 U.S. at 684, 116 S.Ct. 2342 (internal quotation marks and citation omitted).

In *Garcetti,* the Supreme Court set forth an additional requirement for determining whether a public employee's speech is protected under the First Amendment. The Supreme Court held that even when a public employee's speech touches on matters of public concern, it does not enjoy First Amendment protection if the employee is speaking pursuant to his or her official duties rather than as a citizen. *Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951. In *Garcetti,* deputy district attorney Ceballo, a calendar deputy, was asked by defense counsel to look into whether an affidavit filed by the sheriff's department in support of a search warrant was inaccurate. *Id.* at 413–14, 126 S.Ct. 1951. According to Ceballo, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases. *Id.* at 414, 126 S.Ct. 1951. Ceballo submitted a disposition memorandum to his supervisors, in which he concluded that the affidavit con-

tained serious misrepresentations and recommended dismissal of the case. *Id.* After an acrimonious meeting with sheriff's department employees, the district attorney's office proceeded with the prosecution, and the trial court later rejected the defense challenge to the warrant. *Id.* at 414–15, 126 S.Ct. 1951. When Ceballo was subsequently reassigned, transferred, and passed over for a promotion, he filed suit alleging that his supervisors were retaliating against him for the disposition memo. *Id.* at 415, 126 S.Ct. 1951.

The Supreme Court held that the memo did not constitute protected speech because Ceballo did not speak as a citizen when he wrote it. *Id.* at 421–22, 126 S.Ct. 1951. Rather, he spoke as a prosecutor fulfilling his responsibility to advise his supervisors about how best to proceed with a pending case. *Id.* at 421, 126 S.Ct. 1951. The Supreme Court declared: "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

In *Garcetti,* the parties did not dispute that Ceballos wrote his disposition memo pursuant to his employment duties, and the Supreme Court expressly declined "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti,* 547 U.S. at 424, 126 S.Ct. 1951. The Supreme Court declared only that "[t]he proper inquiry is a practical one," noting that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 425, 126 S.Ct. 1951.

■ In *Posey v. Lake Pend Oreille School District No. 84,* 546 F.3d 1121 (9th Cir.2008), the Ninth Circuit held that although the Supreme Court in *Connick* de-

clared that whether speech is protected under the First Amendment is an issue of law, *see Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684 ("The inquiry into the protected status of speech is one of law, not fact."), after *Garcetti,* the issue of whether the plaintiff spoke as a public employee or as a private citizen is a mixed question of fact and law. *Id.* at 1127–29. Whether the plaintiff's speech addressed an issue of public concern, however, is purely an issue of law. *Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir.2009); *see also Gibson v. Office of the Attorney General,* 561 F.3d 920, 925 (9th Cir.2009).

Thus, to summarize, in evaluating a First Amendment retaliation claim by a public employee or independent contractor, the Court must address a "sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Eng,* 552 F.3d at 1070. Plaintiff has the burden of showing that: (1) "the speech addressed an issue of public concern"; (2) "the speech was spoken in the capacity of a private citizen and not a public employee"; and (3) "the state took adverse employment action" and the speech "was a substantial or motivating factor in the adverse action." *Id.* at 1070–71. Only if plaintiff passes these three tests does the burden shift to the defendants to show that, under the *Pickering* balancing test, the government's interests outweigh the plaintiff's First Amendment rights, or that it would have taken the

same action even in the absence of the protected conduct. *Id.* at 1071–72.

### B. *Protected Status of Plaintiff's Speech*

As an initial matter, plaintiff does not clearly identify the speech at issue, *i.e.*, the protected speech that he contends caused his termination from the attorney appointment list. At times, plaintiff states that the decision to remove him from the attorney appointment list was motivated by his July 14, 2003 letter to defendant Speed and his September 2, 2003 letter to Wadkins; elsewhere, he contends that his termination was motivated by other letters he sent to Board officials, as well as by his advocacy of his clients' constitutional rights during hearings and his pursuit of administrative remedies on their behalf. (Jacobson Decl. ¶ 12 & n. 6; Jacobson Rev. Decl. at 14–15, 28–29; Pl. Rev. Opp. at 15–16).

### 1. *Plaintiff's July 14, 2003 Letter to Speed and September 2, 2003 Letter to Wadkins Do Not Address Matters of Public Concern*

■ Defendants contend that plaintiff's July 14, 2003 letter to defendant Speed and his September 2, 2003 letter to defendant Wadkins do not address matters of public concern. (Def. Motion at 16). This is a question of law for the Court. *Gibson*, 561 F.3d at 925; *Eng*, 552 F.3d at 1070.

In his July 14, 2003 letter to defendant Speed, plaintiff is responding to Speed's July 1, 2003 letter notifying plaintiff that the investigation of the incident involving parole agent Murria was complete and plaintiff would be restored to the attorney appointment list. (Def. Exh. S; Speed Decl., Exh. A). In his July 1, 2003 letter, Speed advised plaintiff that he had determined that plaintiff's cross-examination of Murria, although aggressive, was not inappropriate, but that plaintiff acted inappropriately in approaching her afterwards.

(Speed Decl., Exh. A). In his letter, plaintiff explains why he needed to aggressively cross-examine Murria, and vehemently disputes that he did anything more than tap her on the shoulder to get her attention, or that she ever told him to remove his hand. (Def. Exh. S). Plaintiff opines that Murria lied both at the hearing and in her account of the incident, and expresses his indignation at his suspension during an investigation of the charge. (*Id.*). Plaintiff argues that such a suspension should be preceded by notice and an informal investigation, and expresses a fear that defense counsel of less firmness and greater financial dependence on parole revocation appointments than plaintiff will be deterred from aggressively cross-examining parole agents if any agent can bring about an attorney's suspension from the list by making a baseless charge of inappropriate behavior. (Def. Exh. S).

Plaintiff's September 2, 2003 letter to defendant Wadkins is a response to Wadkins' August 28, 2003 letter notifying plaintiff that the Board was contemplating his removal from the attorney appointment list as a result of missing "second serves" on August 20, 2003, and requesting him to submit a response. (Def. Exh. T; Wadkins Decl., Exh. B). In his September 2, 2003 letter, plaintiff states that removal from the attorney appointment list was a draconian penalty for a single accidentally missed "second serve" appointment, and could only have been motivated by retaliation for plaintiff's successful refutation of the charges against him made by defendant Murria. (Def. Exh. T). Plaintiff expresses concerns about attacks on his professional reputation and about a hostile work environment faced by him and other parole revocation defense attorneys. (*Id.*).

■ "The Supreme Court has held that speech involves a matter of public concern when it fairly can be said to relate

to 'any matter of political, social, or other concern to the community.'" *Gibson*, 561 F.3d at 925 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). Whether an employee's or contractor's speech addresses a matter of public concern, and thus is protected by the First Amendment, must be decided based on the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. Generally, when an employee or independent contractor complains about his own job treatment, his speech does not address a matter of public concern. *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir.2004) ("[T]he type of personnel matters that we have deemed unprotected under the public concern test are employment grievances in which the employee is complaining about her *own* job treatment, not personnel matters pertaining to others." (emphasis in original)); *see also Robinson v. York*, 566 F.3d 817, 823 (9th Cir.2009) ("Reports pertaining to *others*, even if they concern personnel matters including discriminatory conduct, can still be 'protected under the public concern test.'") (quoting *Thomas*, 379 F.3d at 808; emphasis added). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684; *see also Gibson*, 561 F.3d at 925 ("[S]peech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies." (quoting *McKin-*

*ley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983))).

Both the letters at issue here concern the Board's treatment of plaintiff: the July 14, 2003 letter to defendant Speed concerns plaintiff's investigation and temporary suspension in connection with the incident involving agent Murria, and the September 2, 2003 letter to defendant Wadkins concerns plaintiff's missed "second serves" appointment and notice that the Board was contemplating plaintiff's removal from the list. The issues that plaintiff has regarding these letters do not involve matters of public concern. *See Connick*, 461 U.S. at 146–47, 103 S.Ct. 1684; *see also Gibson*, 561 F.3d at 926 (deputy attorney general's representation of co-worker in a private legal malpractice action, which led to their termination by the attorney general's office, did not involve matters of public concern).

Plaintiff argues that the quality of representation afforded to indigent parole violators is a matter of public concern, and that he expressed in his letters a general concern that the quality of representation provided to parolees would be chilled if zealous appointed counsel faced a prospect that their zeal would provoke pretextual charges resulting in their suspension or termination from the appointment list. (Pl. Rev. Opp. at 7–8). The Ninth Circuit has held that "statements presenting mixed questions of private and public concern properly fall within the scope of First Amendment protection." *Posey*, 546 F.3d at 1130 n. 5 (internal quotation marks and citation omitted). This statement, however, contemplated a situation where a letter addressed both topics of public concern and personal grievances. *See id.* at 1124, 1130 (Posey's letter expressing concerns about school's security and safety policies satisfied the "public concern" test even though a part of the letter addressed his private grievances with respect to his

treatment by the school principal); *see also Connick*, 461 U.S. at 146–49, 103 S.Ct. 1684 (concluding that questionnaire submitted to district attorney's office staff addressed internal office matters not of public concern, except for a question about pressure to support political campaigns, which touched upon a matter of public concern and was subject to the balancing stage of the protected speech inquiry). Here, the statements that plaintiff contends involve matters of public concern are incidental to his arguments that his suspension from the attorney appointment list was unjustified and that a permanent removal from the list would be a disproportionate sanction. (Def. Exh. S). Plaintiff merely draws generalizations from his own experience and speculates as to what would happen *if* defendants treated other

parole revocation defense counsel the way they treated him. (*Id.*). He does not contend that any such chilling effect on other attorneys has occurred; he complains solely about actions directed at *him*. *See Connick*, 461 U.S. at 154, 103 S.Ct. 1684 (warning against attempts to constitutionalize employee grievances).

In light of the Court's conclusion that these two letters do not address matters of public concern but only plaintiff's personal problems with the Board, the Court need not undertake a *Garcetti* inquiry into whether the letters were written pursuant to plaintiff's contract with the Board. Because the letters do not address matters of public concern, they do not constitute protected speech under the First Amendment and cannot be the basis of a First Amendment retaliation claim.[10] Defendants,

10. In his Objections, plaintiff invokes the Ninth Circuit's recent decision in *Eng*. (Objections at 6 n. 8). The plaintiff in *Eng* was a deputy district attorney who was assigned to investigate possible fraud and environmental crimes in connection with a school district project. *Eng*, 552 F.3d at 1064. He concluded that no crimes had occurred and, further, that the district attorney's office had improperly leaked to the IRS that the school district had committed fraud. *Id.* According to Eng, his superiors were unhappy with his conclusions and retaliated against him. *Id.* They commenced a sexual harassment investigation although the alleged victim protested that no sexual harassment had occurred, demoted and suspended him, and brought misdemeanor charges against him for misusing an office computer. *Id.* at 1065. After Eng's attorney told the Los Angeles Times that Eng was prosecuted because he had refused to file criminal charges against school district officials, the district attorney's office suspended Eng and later passed him over for promotion. *Id.*

In his Section 1983 action, Eng contended that the defendants retaliated against him for exercising his First Amendment right to comment regarding the school project and the leaks to the IRS, and to speak through his attorney to the press. *Eng*, 552 F.3d at 1066. The district court ruled that Eng's

recommendations that no criminal charges be brought were made pursuant to his job duties and were not protected speech, but denied summary judgment with respect to Eng's comments about the leaks to the IRS and his counsel's statements to the press. *Id.* The Ninth Circuit affirmed. *Id.* at 1066. Although the defendants did not contest on appeal that plaintiff's speech pertained to matters of public concern, the Ninth Circuit declared that there was little doubt that the leaking of information by the district attorney's office to the IRS regarding the school district's lease-purchase arrangement was a matter of public concern, and that statements to the press by Eng's lawyer regarding the retaliatory prosecution against Eng were relevant to the public's perception of the agency and thus also involved matters of public concern. *Id.* at 1072–73.

Plaintiff analogizes his July 14, 2003 letter to Speed and his September 2, 2003 letter to Wadkins to Eng's counsel's statements to the press. (Objections at 6 n. 8). Looking at the "content, form, and context" of the statements, however, any similarity is superficial. *Eng*, 552 F.3d at 1070. Eng's attorney told the press that the district attorney's office was prosecuting Eng because he refused to file criminal charges after his superiors had made highly publicized promises that indictments would issue, and because he complained

therefore, are entitled to summary judgment on this portion of Claim Twelve.

**2. *There is No Triable Issue as to Whether Other Speech Identified by Plaintiff As Protected Speech Was Made Pursuant to His Duties As Appointed Counsel, Except for Plaintiff's March 3, 2003 Letter to Washington***

In addition to the July 14, 2003 letter to defendant Speed and September 2, 2003 letter to defendant Wadkins discussed above, plaintiff describes the following letters written by him to Board officials as protected speech: (1) letter dated January 14, 2002 to Associate Chief Deputy Commissioner Washington (Jacobson Rev. Decl. at 29; Pl. Exh. 5); (2) letter dated March 3, 2003 to Washington (Jacobson Rev. Decl. at 32; Def. Exh. R); (3) letter dated March 13, 2002 to Washington (Jacobson Rev. Decl. at 30; Pl. Exh. 6); and (4) letter dated September 22, 2002 to Washington (Jacobson Rev. Decl. at 31, 48; Def. Exh. Q). In addition, plaintiff also contends that defendants removed him from the attorney appointment list in retaliation for his zealous representation of parolees at parole revocation hearings and his pursuit of administrative appeals on behalf of parolees challenging their parole dispositions. (Jacobson Rev. Decl. at 14–15, 17–18).

Defendants do not argue that plaintiff's complaints regarding violations of parolee constitutional rights did not pertain to matters of public concern. Thus, for purposes of these summary judgment motions only, the Court will assume that this requirement is satisfied, and will proceed to

the *Garcetti* inquiry, *i.e.*, whether plaintiff spoke as a private citizen or as appointed counsel.

Plaintiff vehemently disputes that the *Garcetti* requirement is applicable to him at all. First, he points out that the plaintiff in *Garcetti* was an employee of the district attorney's office, not an independent contractor as the Court previously determined plaintiff to be.[11] (Pl. Rev. Opp. at 11–12). However, as previously discussed, the Supreme Court has held that the restrictions imposed by public employers on the speech of public employees and independent contractors are subject to the same analysis. *Umbehr*, 518 U.S. at 684, 116 S.Ct. 2342; *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir.2004); *Ansell v. D'Alesio*, 485 F.Supp.2d 80, 84 (D.Conn. 2007) ("Numerous courts, including the Supreme Court, have concluded that for purposes of retaliation claims brought under the First Amendment, there is no legal distinction between independent contractors with pre-existing contracts ... and full-time employees." (collecting cases)). There is nothing in *Garcetti* that would support a conclusion that the Supreme Court's holding in *Umbehr*—that there is no constitutionally significant difference between government employees and independent contractors with respect to the analysis of their retaliatory termination claims—does not apply when the issue is whether the plaintiff was speaking pursuant to his professional duties or as a private citizen. Plaintiff further argues that the reasoning of *Garcetti* applies only

---

about leaks to the IRS. *Id.* at 1065, 1072–73. The relevance of this information to the "public's evaluation of the performance" of the district attorney's office is clear. *Id.* at 1073. Here, plaintiff's letters to Board officials complaining about his suspension and removal from the appointment list simply do not rise to the same level.

**11.** During the briefing on defendants' Motion to Dismiss the Third Amended Complaint, plaintiff argued that he was an employee of the Board and thus entitled to pursue a wrongful termination claim under state law. The Court determined that plaintiff was an independent contractor. (January 17, 2007 Report and Recommendation at 42–43).

to situations where plaintiffs are under supervision of personnel with whom they are "hierarchically aligned" and to whom they are "substantively accountable," and does not apply to a situation where a plaintiff is employed or otherwise retained by the state not to speak on its behalf, but to oppose it.[12] (Pl. Rev. Opp. at 11–12). The Court agrees that plaintiff was not "substantively accountable" to Board officials for the manner in which he defended the parolees whom he was assigned to represent, or for the defense he elected to present on their behalf. Even so, his contract with the Board placed certain obligations on him with respect to his representation, such as interviewing his clients before their hearings, being prepared for the hearings, not missing the hearings— obligations that plaintiff would have in any case under the professional norms governing competent attorney representation, but that were expressly part of his contract and thus were subject to review by Board officials in determining whether to continue to assign cases to him. (Def. Exh. B at 25, 33, 34). More importantly, there is nothing in *Garcetti* to suggest that the Supreme Court contemplated that there would be exceptions to its scope— situations where a public employee's or contractor's speech would be deemed protected by the First Amendment even though the speech fell within the scope of his or her professional duties.

While the Court has not been presented with authority addressing the application of *Garcetti* to appointed counsel at parole hearings, courts have applied *Garcetti* in similar situations. In *Ansell,* a lawyer and her law firm were under contract with the state of Connecticut's judicial branch to serve as appointed counsel to indigent children and parents in juvenile court. *Ansell,* 485 F.Supp.2d at 81. When their contract was not renewed, they filed suit claiming that the failure to renew the contract constituted retaliation for the law-

---

**12.** Plaintiff cites *Polk County v. Dodson,* 454 U.S. 312, 318–22, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), in which the Supreme Court held that a public defender was not acting under color of state law in rendering legal services and thus was not subject to suit under Section 1983, pointing out that she was "free of state control" in exercising her professional judgment regarding how to represent her client. (Pl. Rev. Opp. at 11). However, the Supreme Court in *Polk* was addressing the obligations of a lawyer employed by a public entity to represent an individual vis-a-vis her client, while the issue here is the rights of the lawyer vis-a-vis officials of the public entity. There is no parallel.

Plaintiff also cites to the Supreme Court's statement in *Legal Services Corp. v. Velazquez,* 531 U.S. 533, 542, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), that an attorney funded by the Legal Services Corporation ("LSC") "speaks on the behalf of the client in a claim against the government for welfare benefits" and "is not the government's speaker." (Pl. Rev. Opp. at 11). The *Velazquez* decision involved the constitutionality of regulations prohibiting LSC-funded lawyers from chal-

lenging existing welfare laws during their representation of their clients. *Id.* at 544–45, 121 S.Ct. 1043. The Supreme Court held that the government could not, consistent with the Constitution, insulate its laws from legitimate judicial challenge in this manner. *Id.* at 549, 121 S.Ct. 1043.

In *Eng,* the Ninth Circuit cited *Velazquez* in concluding that Eng could bring a retaliation claim based on his lawyer's speech. *Eng,* 552 F.3d at 1069–70. The Ninth Circuit stated that *Velazquez* suggests that government action seeking to limit a lawyer's advocacy on behalf of a client implicates the client's as well as the lawyer's First Amendment rights, and that lawyers' representation of public employee plaintiffs would be chilled if the state could retaliate against the employees for their lawyers' advocacy on their behalf. *Id.* at 1069. The *Velazquez* decision, as explicated in *Eng,* has no bearing on whether an attorney appointed by the Board to represent parolees at a revocation hearing speaks as appointed counsel or as a private citizen when he complains of violations of his clients' rights and, by extension, of flaws in the parole system.

yer's vigorous representation of a client, during which she engaged in "heated dialogue" with a judge. *Id.* at 81. The Connecticut district court held that the First Amendment claim was barred by *Garcetti,* because the lawyer's statements to the judge were made "in her official capacity as a court appointed attorney representing a party," and the reasoning of *Umbehr* required the application of *Garcetti* to independent contractors. *Id.* at 84–85.

In *Maras–Roberts v. Phillippe,* 2007 WL 1239119 (S.D.Ind. Apr. 27, 2007), the Indiana district court concluded that *Garcetti* barred a retaliatory termination claim brought by a public defender against the state court judge who employed her. The public defender believed that the judge's practice with respect to placing individuals on probation contravened state law, and corresponded regarding the matter with the public defender council. *Id.* at *1–2. Shortly after she discussed this correspondence with the judge, he terminated her employment, according to him due to communication problems, mistakes she made on plea agreements, and complaints from court staff about her rudeness. *Id.* at *3.

Like plaintiff here, the public defender in *Maras–Roberts* argued that her role as a public defender did not encompass the speech at issue. *Id.* at *5. The district court held that even though the precise scope of her duties as a public defender was a question of fact, there were no facts allowing a reasonable jury to conclude that her speech was made in her capacity as a private citizen. *Id.* But for her employment as a public defender, the plaintiff would not have been permitted to seek the input of the public defender council, nor would she have had access to the judge to voice her concerns about the probation issue. *Id.* Moreover, the plaintiff's own characterization of her duties to her clients in her email to the judge showed that she considered her speech to be "an important

aspect of her advocacy obligations as mandated by her role as public defender," and did not undertake her challenge to what she described as "systemic practices" as a private endeavor disconnected from her public responsibilities. *Maras–Roberts,* 2007 WL 1239119, at *6. Finally, the district court considered it immaterial that the plaintiff had a longstanding personal interest in the probation infraction issue and had spoken out about it even before she was hired for the public defender position. *Id.*

This Court similarly concludes that *Garcetti* applies to plaintiff's claim. Thus, plaintiff's speech was only protected if plaintiff was speaking in his capacity as a private citizen, and not in his capacity as Board-appointed counsel for parolees. *Posey,* 546 F.3d at 1131. The Court now turns to the categories of speech that plaintiff argues were protected.

▮▮▮ First, plaintiff contends that defendants retaliated against him for his zealous representation of parolees at revocation hearings, including his "willingness and ability to identify untruthful testimony by parole agents and police officers through vigorous cross-examination." (Jacobson Rev. Decl. at 18). Plaintiff, however, appeared at the hearings as appointed counsel for his parolee clients pursuant to his contract with the state. Whether vigorous or perfunctory, cross-examination of parole agents and other witnesses is a routine part of the functions performed by defense counsel at a parole revocation hearing. *See Morrissey v. Brewer,* 408 U.S. 471, 488–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parolees entitled to cross-examine witnesses at revocation proceeding). In addition, plaintiff's role as counsel encompassed an obligation to protect the rights of his clients at their parole revocation hearings, and any statements he made at the hearings regarding violations of pa-

rolee rights were made pursuant to this duty. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti,* 547 U.S. at 421–22, 126 S.Ct. 1951; *see Eng,* 552 F.3d at 1071 (if plaintiff's allegations "demonstrate an official duty to utter the speech at issue, then the speech is unprotected"); *Ansell,* 485 F.Supp.2d at 84 (*Garcetti* barred claim that state terminated lawyer's contract to serve as appointed counsel in retaliation for statements made by her to a judge, because these statements were made "in her official capacity as a court appointed attorney representing a party").

 Plaintiff also contends that the protected speech included his pursuit of administrative remedies on behalf of parolees after an adverse parole revocation decision. Plaintiff estimated that he prepared between five and fifteen administrative appeals during the five years he worked as parole revocation counsel. (Jacobson Depo. at 104). He testified that he considered preparing administrative appeals for his clients as part of providing them with representation of superior quality, and from time to time did so even though (except for a period when up to an hour's compensation was allowed) his contract with the Board did not allow for compensation for time spent on administrative appeals. (Jacobson Depo. at 79–80; Pl. Rev. Decl. at 8). Even though he was not required to do so and was not paid for it, plaintiff prepared administrative remedies challenging the parole revocation decisions when

he deemed it appropriate to do so as part of his representation of the parolees whom he had been assigned to represent. *See Maras–Roberts,* 2007 WL 1239119, at *5–6 (public defender challenged the judge's practice with respect to probation infractions as part of her advocacy as a public defender). Indeed, plaintiff does not contend that he ever prepared administrative remedies for parolees whom he did not represent. Thus, plaintiff engaged in this speech pursuant to his professional responsibilities to his parolee clients. Under *Garcetti,* such speech was outside the scope of First Amendment protection.

 Turning to the letters cited by plaintiff, with one exception, each letter concerns a parolee that plaintiff was representing as an appointed counsel under his contract with the Board. In a March 3, 2003 letter to Chief Deputy Commissioner Washington, however, plaintiff complains about procedural and constitutional violations that occurred at the December 27, 2002 and February 5, 2003 parole revocation hearings of his client Teddy Watson. Plaintiff requests a rehearing of those charges and a different deputy commissioner to hear the remaining charge against Watson. (Def. Exh. R). In that letter, plaintiff describes himself as privately retained counsel for Watson. (*Id.*).

 Because plaintiff asserted that he wrote the letter as privately retained counsel for Watson,[13] it appears that plaintiff did not write it pursuant to his duties under his contract with the Board. Or, to put it another way, it appears that plaintiff

---

**13.** Plaintiff identifies himself as Watson's privately retained counsel in the letter, dated March 3, 2003. (Def. Exh. R). However, in his declaration, plaintiff declares that he began to represent Watson privately during his temporary suspension from the attorney appointment list. (Jacobson Rev. Decl. at 65–

66). This did not occur until after the incident with Murria on May 21, 2003. In his Objections, plaintiff explains that he misspoke, and that he began to represent Watson privately around November 19, 2002. (Objections at 23 n. 33, Exh. 3).

was not a public employee when he wrote the March 3, 2003 letter. Although this does not *per se* lead to the conclusion that the letter constitutes protected speech, neither party addresses the significance of plaintiff's employment status within the context of the *Garcetti* inquiry. Thus, the Court concludes that there is a triable issue regarding whether plaintiff's March 3, 2003 letter to Washington constituted protected speech.

As for the other letters cited by plaintiff, each pertains to a parolee whom plaintiff was representing as appointed counsel. In his January 14, 2002 letter to Washington, plaintiff complains about a deputy commissioner's handling of Johnson's parole revocation hearing on January 9, 2001, and about the disposition in that case. (Pl. Exh. 5). Plaintiff protests the deputy commissioner's behavior at the hearing and his attitude towards plaintiff and his client, details various procedural infirmities, and requests that Johnson receive a new hearing. (*Id.*).

In his March 13, 2002 letter to Washington, plaintiff addresses the March 7, 2002 parole revocation hearings of two parolees. (Pl. Exh. 6). Plaintiff discusses the facts underlying the charges against the parolees and the procedural errors at their hearings, and asks Washington to review the decisions. (*Id.*). In his September 22, 2002 letter to Washington, plaintiff discusses two hearings that were postponed by defendant Wadkins. (Def. Exh. Q). Plaintiff complains that Wadkins was discourteous towards himself and abusive towards his clients, and requests Chief Deputy Commissioner Washington to reschedule the hearings before another deputy commissioner. (Pl. Exh. 6).

In each of these letters, plaintiff seeks to change the parole dispositions for his clients and to obtain redress for violations of their rights. Thus, these letters were plainly written in the course of plaintiff's performance of his duties as parole revocation attorney representing his parolee clients and seeking a favorable disposition for them. *See Freitag v. Ayers*, 468 F.3d 528, 545–46 (9th Cir.2006), *cert. denied*, 549 U.S. 1323, 127 S.Ct. 1918, 167 L.Ed.2d 567 (2007) (correctional officer's letters to superiors complaining that her reports of inmate sexual misconduct were being ignored were not protected speech because they were made pursuant to her official duties as a correctional officer; only her letter to a state senator constituted protected speech); *Brown v. Chinen*, 2009 WL 330209, at *10–11 (D.Haw. Feb. 10, 2009) (concluding that state archeologist's comments to his supervisor criticizing agency practices did not constitute protected speech under *Garcetti* because they fell within the requirements of his official duties, but declining to resolve, on a motion to dismiss, whether plaintiff's comments to another official were made pursuant to his official duties); *contrast Eng*, 552 F.3d at 1073–74 (statements constituted protected speech because Eng had no official duty to complain about leaks to the IRS, or to have his counsel complain about retaliatory prosecutions against Eng); *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir.2007) (engineer's complaints about his state employer's corrupt overpayment schemes "were not in any way a part of his official job duties" and thus were protected speech).

The Ninth Circuit's discussion of *Freitag* in *Marable* is instructive. The Ninth Circuit explained that, in *Freitag*, the plaintiff correctional officer was required, as part of her official duties, to report inmate misconduct and to pursue appropriate discipline. Thus, her complaints to prison administrators that her supervisors were ignoring her reports of inmate sexual misconduct could be viewed as complaints that "her supervisors' actions were preventing her from effectively doing her job," and were directly related to her job

duties. *Marable,* 511 F.3d at 932; *see Freitag,* 468 F.3d at 544–46. The plaintiff in *Marable,* on the other hand, was chief engineer of a ferry, and his job in no way included pointing out his superiors' corrupt overpayment schemes. *Marable,* 511 F.3d at 932. Here, as in *Freitag,* plaintiff's duties as appointed counsel required him to protect his clients' procedural and constitutional rights at their parole revocation hearings, and his complaints to senior Board officials that deputy commissioners presiding over their hearings were violating his clients' rights—or, put otherwise, were attempting to prevent him "from effectively doing [his] job"—were directly related to these duties. *See Marable,* 511 F.3d at 932; *Freitag,* 468 F.3d at 544–46.

Plaintiff points out that he was not paid for writing these letters; under the fee schedule in his contract with the state, he could only receive compensation for up to six hours for each case and he had already expended that time by the time he wrote the letters. He further argues the Board contemplated that appointed counsel's representation would terminate after the end of the hearing, and that preparing the letters went beyond the scope of what was expected of him. (Jacobson Rev. Decl. at 8, 10–11; Jacobson Depo. at 59–60; Def.

Exh. B at 22, 30; *see* Objections at 18–19). Plaintiff's willingness to spend uncompensated time to protect his clients' interests, while laudable, is not sufficient to redefine his role as a private citizen speaking on matters of public concern, rather than as his clients' appointed counsel. Indeed, plaintiff testified that he considered the letters part of providing superior quality representation to his clients. (Jacobson Depo. at 80–82, 97). *See Maras–Roberts,* 2007 WL 1239119, at *6 (public defender, who stated in e-mail to defendant judge that when "one encounters systemic practices that arguably are not legal and may hurt the client, then one is obligated to challenge those practices. I am unable to do less," was speaking as a public defender, not a private citizen, in challenging judge's probation practices). Plaintiff's speech indisputably "owe[d] its existence to [his] professional responsibilities." *See Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951.[14] While plaintiff may have viewed the task as a public service, *Garcetti* holds that "[i]t is immaterial whether [a plaintiff] experienced some personal gratification from [his speech]; his First Amendment rights do not depend on his job satisfaction." *Garcetti,* 547 U.S. at 419, 126 S.Ct. 1951; *see also Maras–Roberts,* 2007 WL 1239119, at

**14.** *See also Davis v. Cook County,* 534 F.3d 650, 653 (7th Cir.2008) (concluding that although drafting letters of complaint was not "a core job function of a nurse," plaintiff nurse's memo to superiors that discussed patient care, advocated on behalf of nurses and patients, and described harassment by doctors reflected the concern of a conscientious nurse for the well-being of her patients and was made pursuant to her job responsibilities); *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 693 (5th Cir.2007) (athletic director's memo to school principal criticizing school's use of funds collected at athletic events, although not required by his job duties, was written pursuant to their scope and was not protected speech); *Haynes v. City of Circleville,* 474 F.3d 357, 364 (6th Cir.), *cert. denied,* 552 U.S. 1009, 128 S.Ct. 538, 169 L.Ed.2d 372 (2007) (police dog trainer's memo complaining that proposed reduction in dog-training hours would endanger public safety, although not part of his job description, occurred as part of carrying out his professional responsibilities of training police dogs and thus was made pursuant to his official duties); *Green v. Bd. of County Comm'rs,* 472 F.3d 794, 800–01 (10th Cir.2007) (county juvenile justice center employee who voiced concerns to supervisors and county officials about the center's lack of a confirmation policy for drug screening tests "was not communicating with newspapers or her legislators or performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do").

*6 (plaintiff was speaking as a public defender even though her interest in probation infraction issue predated her public defender role); *see also Posey*, 546 F.3d at 1124 (fact that Posey wrote letter at issue on his own time and with his own resources was not dispositive of whether he wrote it pursuant to his official duties).

Plaintiff argues that, under *Posey*, the Court cannot determine as a matter of law that his letters were written pursuant to his duties under his contract with the Board, and the issue should go to the jury. (Pl. Rev. Opp. at 12–13). However, the Ninth Circuit in *Posey* did not preclude deciding the issue on summary judgment when there is no dispute of material fact regarding the scope of the plaintiff's duties, as there was in *Posey*. In that case, Posey wrote a letter to school district officials expressing concerns about security at the school where he was employed. *Posey*, 546 F.3d at 1125. The parties agreed that he wrote the letter at home, on his own time, and with his own resources, but disputed whether he wrote the letter as part of his official employment responsibilities. *Id.* at 1124. Posey was initially hired as a parking lot attendant, but during the next nine years his job title changed periodically, eventually to "security specialist" responsible for preventing and responding to student misconduct. *Id.* at 1123–24. At some point his job responsibilities were limited to assisting with security and crime prevention and supervising the school buildings, grounds and parking lot. *Id.* at 1125. Significantly, the parties' characterizations of Posey's responsibilities during the pertinent times changed over the course of the litigation.

*Posey*, 546 F.3d at 1125. The Ninth Circuit held that there was a genuine issue of fact as to the scope of Posey's job responsibilities and, therefore, the issue of whether they encompassed the writing of the letter should go to the jury. *Id.* at 1129.

Here, unlike *Posey*, there is no factual dispute regarding the scope of plaintiff's duties and whether they encompassed the speech that allegedly triggered his termination. *See Posey*, 546 F.3d at 1131. Under his contract, it was plaintiff's duty to represent parolees in connection with their parole revocation hearings. Plaintiff's letters to Board officials challenging procedural irregularities and constitutional violations at parole hearings during which he represented parolees as their appointed counsel, and seeking review of unfavorable dispositions, were clearly within the scope of his representation. No rational jury would find that plaintiff's speech was made outside the scope of his duties as counsel for his parolee clients. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *see Maras–Roberts*, 2007 WL 1239119, at *5 (even though precise scope of public defender's job duties was a question of fact, no reasonable jury could find that her speech was not uttered within the scope of her duties). Thus, the Court finds that there is no issue of material fact with respect to the protected status of the speech to submit to the jury.

Except for his March 3, 2003 letter to Washington, plaintiff has failed to raise a triable issue of material fact regarding an essential element of his retaliation claim, namely, the protected status of the speech that triggered the allegedly retaliatory termination.[15] Defendants, therefore, are en-

---

**15.** Defendants discuss two other letters from plaintiff to Washington, one dated June 15, 1999, and one dated April 29, 2002. (Def. Motion at 15; Def. Exhs. O, P). Plaintiff's June 15, 1999 letter addresses his concern about not having received parolee assignments for six weeks, and his April 29, 2002 letter requests review of a deputy commissioner's decision to postpone a revocation hearing and to extend parole. (Def. Exhs. O, P).

Plaintiff does not contend that these two letters were a motivating factor in his termi-

titled to summary judgment on this portion of Claim Twelve.

### C. *There is No Triable Issue As to Retaliatory Motivation with Respect to Plaintiff's March 3, 2003 Letter to Washington*

■ Because the Court has concluded that there is a triable issue of material fact as to whether plaintiff's March 3, 2003 letter to Washington constitutes protected speech, the Court must proceed to the next step of the analysis and determine whether there is evidence that the letter was a "substantial or motivating factor" for the adverse action against him. *Eng,* 552 F.3d at 1071; *see Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *Coszalter,* 320 F.3d at 977; *Keyser v. Sacramento City Unified Sch. Dist.,* 265 F.3d 741, 751 (9th Cir.2001). Neither party disputes the existence of adverse action; plainly, plaintiff's removal from the attorney appointment list qualifies as an adverse action. The parties strongly disagree, however, as to whether plaintiff, as the party with the burden of proof on this issue, has adduced evidence of retaliatory motivation.

Defendants have met their initial burden under *Celotex* of identifying portions of the record that demonstrate no genuine issue of material fact exists, referencing defendant Speed's declaration that he made the decision to remove plaintiff from the attorney appointment list based on plaintiff's "history of missing hearings, being late to hearings, and being unprepared for hearings," and the incident with defendant Murria. Speed also stated that he had never received any information that plaintiff was overzealous in his representation of parolees or critical of the California parole revocation system. (Speed Decl. ¶¶ 3, 4). The burden then shifts to plaintiff to come forth with evidence of retaliatory motivation. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■ Mere evidence that defendants knew of plaintiff's protected speech is not sufficient to show retaliatory motivation. *Keyser,* 265 F.3d at 751 (mere evidence that defendant knew of plaintiffs' charges did not create a triable issue as to whether his decision to reassign them was motivated by the charges); *see also Umbehr,* 518 U.S. at 685, 116 S.Ct. 2342 ("Umbehr must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the Board members before they terminated him."). To create a genuine issue of material fact when the defendant knew of the protected speech but there is no direct evidence of retaliatory motive, the plaintiff must produce circumstantial evidence from which retaliatory motivation can be inferred, such as proximity in time between the protected speech and the alleged retaliation, or the employer's expressed opposition to the speech, or evidence showing that the em-

---

nation from the attorney appointment list. Moreover, in regards to the June 15, 1999 letter, plaintiff declares that he only began to engage in the speech giving rise to the alleged retaliation "[b]eginning in or about the year 2001," and, in fact, objects to the defendants' discussion of events during 1999. (Jacobson Rev. Decl. at 14). The June 15, 1999 letter predates that period. In any event, it discusses only plaintiff's failure to receive parolee assignments and does not discuss matters of public concern.

As for the April 29, 2002 letter, it plainly arose out of plaintiff's representation of parolee Aulavance Tillman at his April 17, 2002 revocation hearing and was written pursuant to plaintiff's duties as Tillman's appointed counsel. (Def. Exh. P). For the reasons discussed above, it does not constitute protected speech. *See Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951.

ployer's proffered explanations were false and pretextual. *Ulrich v. City and County of San Francisco,* 308 F.3d 968, 980 (9th Cir.2002); *Allen v. Iranon,* 283 F.3d 1070, 1077 (9th Cir.2002); *Keyser,* 265 F.3d at 751–52.

However, in this case there is no evidence that any of the defendants knew of the March 3, 2003 letter to Washington. Plaintiff's March 3, 2003 letter was addressed to Washington and was not copied to any of the defendants. The decision to remove plaintiff from the attorney appointment list was made by defendant Speed. (Speed Decl. ¶¶ 3, 4; Cater Decl. ¶ 4). Plaintiff identifies no evidence that Speed had read or was aware of plaintiff's March 3, 2003 letter to Washington. (*See* Jacobson Rev. Decl. at 42–68). There is no evidence that Speed's decision to remove plaintiff from the list was in any way connected to plaintiff's criticisms of the deputy commissioners who presided over Watson's parole revocation hearings, or

plaintiff's representation of Watson. Indeed, Speed testified at his deposition that letters from parolees and their counsel criticizing the deputy commissioners who presided over their revocation hearings were "fairly commonplace." (Transcript of Deposition of Marvin Speed ["Speed Depo."] at 89–90).

Nor does plaintiff produce any evidence that the other defendants were aware of, or influenced by, plaintiff's March 3, 2003 letter to Washington or its subject matter.[16] Instead, plaintiff engages in rank speculation about defendant Wadkins' involvement: he asserts that Wadkins decided to bring about plaintiff's removal from the attorney appointment list as soon as he succeeded to Washington's position as the Acting Chief Deputy Commissioner for the Los Angeles Region and was in a position to do so, and that "it is likely" that plaintiff's private representation of Watson "solidified Wadkins' determination to purge [plaintiff] from the attorney appointment list at the earliest opportunity."[17] (Jacob-

**16.** At his deposition, Washington testified that from time to time he forwarded detailed attorney complaint letters to Board Counsel Moeller. (Deposition Excerpts of Richard Washington, Jr. at 23–24). He characterized the March 3, 2003 letter as a detailed letter, and agreed with plaintiff that it was the type of letter that he "might have" sent to the Board Counsel. (*Id.* at 25). However, this does not constitute evidence from which it could be inferred that the defendants were aware of the letter.

**17.** In his Objections, plaintiff attempts to show a causal link between the March 3, 2003 letter and defendant Wadkins. (Objections at 22–24). As discussed, plaintiff's March 3, 2003 letter to Washington criticized the deputy commissioners who presided over the December 27, 2002 and February 5, 2003 revocation hearings of parolee Watson, who was privately represented by plaintiff. (Def. Exh. R). Plaintiff asserts that defendant Wadkins made the finding of probable cause in connection with the attempted murder and other parole violation charges against Watson, and that Wadkins "may well have formed an animus" against plaintiff for representing Wat-

son because the charges against Watson were so egregious. (Objections at 23). On March 26, 2003, plaintiff successfully defended Watson against the parole violation charges, and resumed representing him when Watson was charged with another parole violation in June 2003. (Objections at 24, Exhs. 3, 4). Sometime in May, Wadkins sent Perez's memorandum regarding the Murria incident to parole officials in Sacramento. (Objections at 24; Deposition Excerpts of Thomas Wadkins. at 21–23). On July 1, 2003, plaintiff wrote to Wadkins, apprising him of his private representation of Watson and mentioning that he had represented Watson at his last hearing, which had resulted in the dismissal of "a dubiously brought serious charge.". (Objections, Exh. 4). On August 28, 2003, Wadkins notified plaintiff that he was being considered for removal from the attorney appointment list as a result of missing "second serve" appointments; he subsequently recommended to defendant Cater that plaintiff be suspended from the list. (Wadkins Decl. ¶ 6, Exhs. A, B). Plaintiff contends that this constitutes sufficient circumstantial evidence that Wadkins took these actions to retaliate against plaintiff

son Rev. Decl. at 48, 49). This is not evidence. "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1027 (9th Cir.2001).

It goes without saying that an employer cannot have retaliated against an employee for his protected speech if it was not aware of the speech. *See Allen*, 283 F.3d at 1076 (citing *Keyser*, 265 F.3d at 750–51). Plaintiff has adduced no evidence whatsoever that his statements in his March 3, 2003 letter constituted a substantial or motivating factor for his termination. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. Thus, plaintiff has not raised a triable issue as to this element of his claim. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

### D. *Conclusion*

In summary, plaintiff's July 14, 2003 letter to defendant Speed and September 2, 2003 letter to defendant Wadkins are not, as a matter of law, protected speech under the First Amendment because they do not address matters of public concern. With the exception of plaintiff's March 3, 2003 letter to Washington, the undisputed evidence shows that the other speech that plaintiff contends was protected speech was made pursuant to his duties as appointed counsel. Thus, except for the March 3, 2003 letter, the Court need not determine whether plaintiff has adduced evidence that his speech constituted a substantial or motivating factor for his termination. Because the speech was not protected under the First Amendment, defendants are entitled to summary judgment regardless of retaliatory motivation.[18]

With respect to plaintiff's March 3, 2003 letter, plaintiff has not presented credible evidence of a retaliatory motive or shown that a triable issue of material fact exists as to this element.[19] Accordingly, defendants' Motion for Summary Judgment as to Claim Twelve should be granted and plaintiff's cross-motion should be denied.

---

for his zealous defense of Watson's constitutional rights. (Objections at 25).

All this shows, however, is that defendant Wadkins knew, at least by July 1, 2003, that plaintiff had represented Watson and had succeeded in obtaining dismissal of the parole violation charges against him. Missing from this scenario, however, is any evidence from which it could be inferred that defendant Wadkins engineered plaintiff's removal from the attorney appointment list in retaliation for plaintiff's successful defense of Watson, or plaintiff's criticisms of the deputy commissioners presiding over Watson's hearings.

18. Nevertheless, the Court notes that in all of plaintiff's voluminous filings there is not a shred of evidence tying defendant Murria, a parole agent, to the decision to terminate plaintiff from the attorney appointment list. Plaintiff's theory in the Third Amended Complaint was that defendant Murria fabricated the charge that he placed his hand on her shoulder, causing him to suffer a temporary suspension from the list and contributing to his eventual termination. (Third Amended Complaint ¶¶ 113, 128 & n. 42). However, defendant Murria testified that, while plaintiff did indeed place his hand on her shoulder, she never complained about it or pursued the matter. (Murria Depo. at 80–81). Thus, what actually happened during plaintiff's encounter with defendant Murria is irrelevant to his retaliatory termination claim against her. Plaintiff has come forth with no evidence showing a triable issue as to Murria's personal involvement in his termination. *See Taylor*, 880 F.2d at 1045. According to the undisputed evidence, she had none.

19. Thus, the burden of proof has not shifted to defendants to show that they would have terminated plaintiff even in the absence of his speech, and the Court does not reach plaintiff's arguments that defendants have not met this burden.

## II. THE COURT SHOULD NOT EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S PENDENT STATE CLAIMS

Claims Thirteen and Eighteen are pendent state claims arising under state law. The doctrine of supplemental jurisdiction permits the Court to exercise jurisdiction over "other claims" in the same case or controversy as a claim within the district court's original jurisdiction. *See* 28 U.S.C. § 1367(a). Title 28, United States Code, Section 1367(c)(3), however, allows the district court to decline to exercise supplemental jurisdiction over pendent state claims if it has dismissed all claims over which it has original jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (if no viable federal claims exist, federal court may decline to exercise supplemental jurisdiction over pendent state claims); *Voigt v. Savell,* 70 F.3d 1552, 1565 (9th Cir.1995); 28 U.S.C. § 1367(c)(3). In light of the Court's conclusion that defendants are entitled to summary judgment on plaintiff's remaining federal claim, the Court recommends that the district court decline to exercise supplemental jurisdiction over plaintiff's state law claims.

### RECOMMENDATION

THE COURT, THEREFORE, RECOMMENDS that the district court issue an Order: (1) accepting and adopting this Amended Report and Recommendation; (2) granting defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56; (3) denying plaintiff's Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56; and (4) directing that judgment be entered dismissing this action, with prejudice as to Claim Twelve and without prejudice as to Claims Thirteen and Eighteen.